**United States District Court**
**Southern District of Ohio**
**Eastern Division**

Chester A. Williams,

       Plaintiff,

    v.                                                    Case No. 2:03-cv-868
                                                          Judge Smith
United Dairy, Inc.,                                       Magistrate Judge Kemp

       Defendant.

<u>**OPINION AND ORDER**</u>

Plaintiff, Chester A. Williams, brings the present action against his former employer,

United Dairy, Inc., alleging employment discrimination and defamation.  Specifically, plaintiff

alleges defendant discriminated against him by creating a hostile work environment, discharging

him because of his race, and retaliating against him, all in violation of Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000(e), et seq. ("Title VII").  Plaintiff also alleges that

defendant made defamatory statements about him in violation of Ohio law.  Defendant moves for

summary judgment on all claims.  Defendant further moves to strike several items from the

record.  For the following reasons, the Court **GRANTS** defendant's motion for summary

judgment and defendant's motion to strike.


# I.  INTRODUCTION

## A.  Facts

### 1.  United Dairy, Inc.

Defendant United Dairy, Inc. (United Dairy) is a family-owned business that produces,

packages, and distributes food and beverage products.  United Dairy has a plant and trucking

operations in Martin's Ferry, Ohio.  At all relevant times, Joseph Carson was United Dairy's

president, George Wood was United Dairy's chief financial officer, Daniel Strope was

distribution manager, and David Tucker was a route supervisor.

United Dairy employs several drivers responsible for following assigned routes in

delivering products to United Dairy's customers.  The company ran approximately 38 routes out

of its Martin's Ferry plant during plaintiff's employment.  United Dairy employs both "regular"

drivers, who run the same route on a regular schedule, and "relief" drivers, who help out and

cover routes as needed.  The company's drivers are members of Local Union No. 697 ("Union")

and the terms and conditions of their employment are governed by a Collective Bargaining

Agreement ("CBA").  The CBA has a nondiscrimination provision, as well as a provision

providing that its grievance and arbitration procedure is the exclusive means for resolving all

disputes under the Agreement.  The CBA also has a no-strike clause and a provision mandating a

loss of seniority for failing to report work absences within three days.

## 2.  Plaintiff's Employment Through August 2001

Plaintiff Chester A. Williams began his employment as a relief driver with United Dairy

on August 28, 2000.  Plaintiff was a member of the Union and thus covered by the CBA.  One

week in winter of 2000-01, defendant assigned plaintiff to go on a route with Roy Litwin, a

regular driver, so that plaintiff could learn Litwin's route.  During the ride Litwin ignored

plaintiff, kept the passenger side window down, and played the radio loudly.  Upon returning to

the plant, Litwin told plaintiff to "fuel my truck up."  (Williams Dep. 221).  Feeling that Litwin's

actions were motivated by prejudice, plaintiff complained to Strope, who subsequently

transferred plaintiff to another route.  Strope also investigated the matter and was told that Litwin

treats all drivers in a similar manner.  Nevertheless, Strope warned Litwin that any racial insensitivity would not be tolerated.

Between February 3, 2001 and April 19, 2001 plaintiff went on medical leave.  Before placing him back on the work schedule, United Dairy asked plaintiff to take a drug test and to turn in delinquent log books.  This is common practice for United Dairy whenever an employee wishes to return from medical leave.  United Dairy has requested the same of several white employees in the past.  As a result of this request, plaintiff filed a grievance under the CBA, claiming that he was being discriminated against.  Eventually, the matter was settled and plaintiff returned to work.

On or about July 26, 2001, defendant again scheduled plaintiff to work with Litwin.  Plaintiff later wrote a "letter of protest" to Carson claiming that Litwin was a known racist and that Litwin discriminated against plaintiff in the past.  The letter also complained about plaintiff's employee requirements for returning from medical leave.  Immediately upon receipt of this letter, Carson reassigned plaintiff to another route, but plaintiff failed to return to work for the remainder of the week.  Carson also investigated the matter and informed plaintiff that he was assigned to ride with Litwin in order to learn the route.  Carson also stated that United Dairy was under the impression that plaintiff's problems with Litwin were in the past.

Due to several injuries and call-offs by drivers the week of August 12, 2001, Tucker made several changes to drivers' schedules.  Tucker changed plaintiff's schedule, as well as the schedules of five Caucasian drivers.  Plaintiff claimed the schedule changes were discriminatory and refused to report to work on Thursday or Friday of that week.  In response, United Dairy suspended plaintiff on August 17, 2001.

Plaintiff held his first of two protests in front of United Dairy's plant from August 20, 2001 through August 22, 2001.  Plaintiff carried a sign referring to racism, scheduling problems, harassment, and Department of Transportation ("DOT") violations at United Dairy.  Plaintiff notified a local television station about the protest.  WTOV News 9 interviewed plaintiff and broadcasted the interview on television.  The interview included statements by plaintiff that he had been called "nigger" and "monkey" at United Dairy.[1]

In response to the protest, Carson and Wood conducted an immediate investigation. Carson spoke with plaintiff in front of the plant on August 20, 2001, and plaintiff complained about Litwin and Happapura.  Carson and Wood conducted several interviews, including those of Litwin, Happapura, and other United Dairy drivers.  Litwin and Happapura denied making racist remarks, and the other drivers denied hearing any inappropriate comments.  Nonetheless, United Dairy then issued a new anti-discrimination policy (consistent with the CBA policy) and conducted anti-discrimination training for all of its Martin's Ferry employees and supervisors. Carson also explained to all employees that United Dairy takes discrimination seriously and will not tolerate it in the workplace.  Plaintiff testified that the protest "was successful in getting the words stopped and leaving the buckets up in my truck."  (Williams Dep. 337).

**3.  Relevant Events After August 2001**

Williams went on workers' compensation leave from February 15, 2002 until June 2, 2002.  While on leave, United Dairy posted an opening for a regular route driver.  Williams

---

[1] Plaintiff also testified he heard racist slurs in the workplace on five separate occasions in 2001.  First, he testified that he heard Litwin use a racist slur on three occasions.  (Williams Dep. 251-52, 255-59).  Second, he claims that he heard a mechanic, Tom Happapura, say "we should have one of them still today" in reference to an African-American visitor.  (Williams Dep. 266-68).  Third, he testified he overheard someone yell, "porch monkey." (Williams Dep. 272-73).  Also, plaintiff discusses an incident where someone left a bucket and toilet paper in his truck along with derogatory words on a newspaper.  (Williams Dep. 216, 337).

4

informed Tucker he was interested, and United Dairy agreed to hold the position open for him while he was on leave. Also, while plaintiff was on leave, the Ohio Department of Agriculture advised United Dairy not to permit non-production personnel in the plant in order to help prevent contamination of United Dairy's food products. Based on this advise, United Dairy implemented a new company rule prohibiting drivers from entering the plant. Plant Supervisor Don Guy was responsible for enforcing the rule.

Shortly after plaintiff's return to work, Guy told plaintiff not to enter the plant. This was consistent with what he had been telling all drivers, including many Caucasians, since the company implemented the new policy. Plaintiff perceived the warning as a racist comment, but did not file a complaint or grievance.

On Friday, July 12, 2002, a sales representative asked plaintiff to pick up two extra pallets of orange juice from one of his regular stops in Pennsylvania and to deliver them to two other stops in Pennsylvania. Since plaintiff felt that this would require him to work more hours than permitted by the DOT, he refused to carry out the extra deliveries. One of United Dairy's largest customers on the route complained about the incident.

Since Williams was now a regular route driver, United Dairy did not always post his name on the weekly driver's schedule. United Dairy also routinely did not list other regular route drivers on the schedule since these drivers already knew what route they would be running and when they would be running it. For example, six regular route drivers, including plaintiff, were not listed on the schedule for the week of July 7, 2002. However, plaintiff still worked his regular schedule that week.

Upon returning to Martin's Ferry on Saturday, July 13, 2002, plaintiff did not see his

5

name or route on the weekly schedule.  Based on his absence from the schedule, as well as Don

Guy's comment which plaintiff perceived as discriminatory, Williams concluded that United

Dairy was discriminating against him.  Thereafter, he held his second protest in front of United

Dairy's plant on July 15, 2002.  Plaintiff failed to report for work on all three of his regular

scheduled days of that week.[2]  As a result of his three absences, United Dairy discharged

plaintiff.

In November 2002, plaintiff sought employment with Advantage Tank Lines

("Advantage") as a driver.  Advantage did not award him the job in large part because of his

failure to fully list his prior employment history.  Moreover, some of this employment history

contained minor accidents while driving for other companies.

### B.  Plaintiff's Claims

As a preliminary matter, it is not clear exactly what claims plaintiff asserts in his

complaint and on what grounds he seeks to recover.  An examination of the complaint seems to

yield four separate claims.  The Court is aware of the fact that it is not required to conjure up

claims for a plaintiff.  See Wells v. Brown, 891 F.2d 591, 594 (6th Cir. 1989).  However,

considering the fact that plaintiff is proceeding pro se, the Court will construe the complaint as

asserting four separate and distinct claims for relief.  These claims are (1) Hostile environment

discrimination under Title VII, (2) Discriminatory discharge under Title VII, (3) Retaliation

under Title VII, and (4) Defamation under Ohio law.

## II.  STANDARD OF REVIEW

---

[2] Besides his knowledge of the regular route he was assigned to on specific days, he was also told by a co-worker that he was on the schedule for that week.  (Williams Dep. 361-63).

The standard governing summary judgment is set forth in Fed. R. Civ. P. 56(c), which provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is appropriate, however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986).

When reviewing a summary judgment motion, the court must draw all reasonable inferences in favor of the nonmoving party, and must refrain from making credibility determinations or weighing the evidence. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150-51 (2000).[3] A court must disregard all evidence favorable to the moving party that a jury would not be required to believe. Id. Stated otherwise, a court must credit evidence favoring the nonmoving party as well as evidence favorable to the moving party that is

---

[3] Reeves involved a motion for judgment as a matter of law made during the course of a trial under Fed. R. Civ. P. 50 rather than a pretrial motion for summary judgment under Fed. R. Civ. P 56. Nonetheless, the standards applying to both types of motion are substantially the same. One notable difference, however, is that in ruling on a motion for judgment as a matter of law, the court, having already heard the evidence admitted during trial, considers the record in its entirety. Reeves, 530 U.S. at 150. This stands in contrast to the procedure for deciding summary judgment in that a District Court will not have heard all the evidence. Accordingly, the non-moving party has an affirmative duty to point out those portions of the paper record upon which it relies in asserting a genuine issue of material fact; a court need not comb the paper record for the benefit of the moving party. In re Morris, 260 F.3d 654, 665 (6th Cir. 2001). As such, Reeves did not introduce a "heightened" standard of review for summary judgment motions.

uncontroverted or unimpeached, if it comes from disinterested witnesses.  Id.

Thus, the Sixth Circuit Court of Appeals has recognized that Liberty Lobby, Celotex, and Matsushita have effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments.  Street v. J.C. Bradford & Co., 886 F.2d 1472, 1476 (6th Cir. 1989). The court in Street identified a number of important principles applicable to summary judgment practice as a result of this 'decided change.'  For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment.  Id. at 1479.

Additionally, in responding to a summary judgment motion, the nonmoving party "'cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must present affirmative evidence in order to defeat a properly supported motion for summary judgment.'"  Street at 1479 (quoting Liberty Lobby, 477 U.S. at 257).  The nonmoving party must adduce more than a scintilla of evidence to overcome the summary judgment motion. Street at 1479.  It is not sufficient for the nonmoving party merely to "'show that there is some metaphysical doubt as to the material facts.'"  Street at 1479 (quoting Matsushita, 475 U.S. at 586).  Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact."  Id. at 1479-80.  That is, the nonmoving party has an affirmative duty to direct a court's attention to those specific portions of the record upon which it seeks to rely in creating a genuine issue of material fact.  In re Morris, 260 F.3d 654, 665 (6th Cir. 2001).


### III. ANALYSIS

8

**A.  Defendant's Motion to Strike**

In plaintiff's response to defendant's motion for summary judgment, plaintiff refers to news footage of an interview with one of plaintiff's co-workers purportedly describing discrimination at United Dairy.  Plaintiff also includes a document titled "Telephone Reference Inquiry" and a letter from Advantage Tank Lines dated April 2, 2003.  Defendant moves to strike the WTOV News 9 video footage ("news footage"), the Telephone Reference Inquiry ("phone inquiry"), and the April 2, 2003 letter.  For the following reasons, the Court **GRANTS** defendant's motion.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Fed. R. Evid. 803.  Hearsay evidence may not be considered on a motion for summary judgment.  Jacklyn v. Schering-Plough Healthcare Products Sales Corp., 176 F.3d 921, 927 (6th Cir. 1999).  Furthermore, to be admissible for summary judgment purposes, "documents must be authenticated by and attached to an affidavit...."  10A Wright, Miller, & Kane, Federal Practice & Procedure, Civil 3d § 2722 (West 1990); see also Lomax v. Sears, Roebuck & Co., 2000 WL 1888715, *5 (6th Cir. Dec. 19, 2000) (explaining how a work schedule is inadmissible partly because the party did not authenticate it.).  Finally, "a letter submitted for consideration under Rule 56(e) must be attached to an affidavit and authenticated by its author in the affidavit or a deposition."  Wright & Miller, Civil 3d § 2722.

The news footage must be stricken since it constitutes inadmissible hearsay by plaintiff's co-worker being offered for the truth of the matter asserted.  Plaintiff makes reference to the footage in support of his argument that United Dairy did in fact discriminate against him.  (Pl.

Memo. Opp. S.J. 1).  Second, the phone inquiry must also be stricken since it has not been properly authenticated and it constitutes inadmissible hearsay.  Plaintiff has not attached an affidavit authenticating the document nor has he attempted to do so through any deposition.[4] Finally, the letter must also be stricken since it has not been authenticated by its author and constitutes inadmissible hearsay.  Plaintiff does attach an affidavit of Becky J. Perlaky ("Perlaky Aff."), the author of the letter, to his memo in opposition to defendant's motion to strike. However, the affidavit, which was originally submitted by defendant (Def. Memo. S.J., Ex. D), only generally discusses plaintiff's application process with Advantage Tank Lines, but fails to specifically authenticate the April 2, 2003 letter.

Therefore, the Court strikes the news footage, phone inquiry, and April 2003 letter from the record.  The Court will not consider the three items in the following summary judgment analysis.

## B.  Hostile Work Environment / Racial Harassment

Defendant avers that plaintiff's racial harassment claim must fail since plaintiff failed to file a timely discrimination charge with the EEOC.  Defendant further argues that, even if the EEOC complaint was timely, plaintiff's claim still fails since defendant took prompt remedial action in response to plaintiff's complaint.

**1.  Timeliness**

A plaintiff alleging Title VII employment discrimination must file a timely complaint with the EEOC before bringing suit in federal court.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 798 (1973).  The U.S. Supreme Court has stated: "Strict Adherence to Title VII's

---

[4] Plaintiff notes that Ms. Perlaky refers to receiving information from United Dairy concerning plaintiff's employment in her July 2004 deposition.  However, this is simply not specific enough to authenticate the phone inquiry.

timely filing requirements is the best guarantee of evenhanded administration of the law."

National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002).  Title VII's filing

requirements are as follows:

> A charge under this section shall be filed within one hundred and eighty days
> after the alleged unlawful employment practice occurred....except that in a case of
> an unlawful employment practice with respect to which the person aggrieved has
> initially instituted proceedings with a State or local agency with authority to grant
> or seek relief from such practice...such charge shall be filed...within three hundred
> days after the alleged unlawful employment practice occurred...."

42 U.S.C. § 2000e-5(e)(1).  The requirement that the charge be filed after the unlawful

employment practice occurred "means that a litigant has up to 180 or 300 days *after* the unlawful

practice happened to file with the EEOC." National Railroad, 536 U.S. at 102.  For hostile work

environment claims, "provided that an act contributing to the claim occurs within the filing

period, the entire time period of the hostile environment may be considered for the purposes of

determining liability."  Id. at 103.

Plaintiff filed his first complaint with the EEOC on October 21, 2002.  However, plaintiff

testified that the alleged harassment stopped around August of 2001.  After plaintiff held his

protest on August 20-22, 2001, and defendant United Dairy issued an anti-discrimination policy

and held anti-discrimination training on August 23, 2001, plaintiff no longer experienced any

racial harassment.  (Williams Dep. 336-37, 341-42).  Plaintiff testified "I accomplished what I

set out to get accomplished, to stop it."  (Williams Dep. 336).  The alleged incidents that had

occurred before the protest, including racist comments by coworkers, general rudeness by

coworkers, and the placement of a bucket and toilet paper in plaintiff's truck, had all stopped

after August 2001.  (Williams Dep. 336-37) ("[The protest] was successful in getting the words

stopped and leaving the buckets up in my truck.").  The only other incident alleged, Don Guy's

11

February 2002 warning to plaintiff to stay out of the plant, does not qualify as an act contributing to the hostile environment.  The record evidence is clear that defendant United Dairy had instituted a new policy of not allowing any drivers into the plant based on advice from the Ohio Department of Agriculture.  The purpose was to restrict access for non-production personnel in order to help prevent contamination of United Dairy's food products.  (Carson Aff. ¶ 8).  Don Guy, as plant supervisor, was consistent in cautioning all drivers about the new policy regardless of race.  (Guy Aff. ¶ 3).

No act contributing to the hostile environment claim occurred within 300 days of filing the EEOC complaint.  Therefore, defendant is entitled to summary judgment with respect to the hostile work environment claim.

**2.  Defendant's Response to Complaints**

To establish a prima facie case of hostile work environment under Title VII, a plaintiff must show: (1) that he is a member of a protected class; (2) that he was subjected to unwelcome racial harassment; (3) that the harassment was based on race; (4) that the harassment had the effect of unreasonably interfering with his work performance by creating an intimidating, hostile, or offensive work environment; and (5) the existence of employer liability.  Vitt v. City of Cincinnati, 2004 WL 1147256, *2 (6th Cir. May 20, 2004); Hafford v. Seidner, 183 F.3d 506, 512 (6th Cir. 1999).  The fifth element, the existence of employer liability, means "the employer knew or should have known of the charged [] harassment and failed unreasonably to take prompt and appropriate corrective action."  Fenton v. Hisan, Inc., 174 F.3d 827, 830 (6th Cir. 1999).  In other words, "when an employer responds to charges of coworker [] harassment, the employer can be liable only if its response manifests indifference or unreasonableness in light of the facts

the employer knew or should have known." Id. at 829, quoting, Blankenship v. Parke Care

Centers, Inc., 123 F.3d 868, 872-73 (6th Cir. 1997), cert. denied, 522 U.S. 1110 (1998).

The Court finds United Dairy's responses to plaintiff's various complaints were prompt

and reasonable. First, in response to plaintiff's complaint regarding Litwin's behavior toward

him in the winter of 2000, United Dairy reassigned plaintiff to another route for the rest of the

week. Also, Strope immediately investigated the matter and warned Litwin that racial

insensitivity would not be tolerated even though Litwin denied any wrongful conduct. Second,

in response to plaintiff's letter of protest in July 2001 about having to ride with Litwin, United

Dairy promptly reassigned plaintiff to another route. Third, in response to plaintiff's protest in

August 2001 regarding racial slurs and inappropriate comments, Carson and Wood conducted an

immediate investigation. Carson later warned Litwin and Happapura that discrimination would

not be tolerated at United Dairy, even though the investigation was inconclusive. Moreover,

United Dairy distributed an anti-discrimination policy and conducted company training

regarding workplace discrimination.

The Court finds as a matter of law that United Dairy's responses to the various

complaints were reasonable, prompt, and effective.[5] Plaintiff has failed to prove a prima facie

case of hostile work environment discrimination. Therefore, defendant is entitled to summary

judgment on the hostile work environment claim.

### C. Discriminatory Discharge

Plaintiff alleges he was discharged because of his race. Defendant avers that plaintiff

cannot prove discriminatory discharge by direct or circumstantial evidence. Defendant further

---

[5] As stated previously, plaintiff testified that the alleged racial comments and activities stopped after August 2001.

argues even if plaintiff could prove a prima facie case of discrimination, plaintiff cannot establish that the non-discriminatory reasons given for his discharge are a pretext for discrimination.

Title VII provides in relevant part that "[it] shall be an unlawful employment practice for an employer...to discharge any individual...because of such individual's race...."  42 U.S.C. § 2000e-2(a)(1).  A plaintiff may establish a Title VII claim of race discrimination through direct or circumstantial evidence.  Johnson v. Univ. of Cincinnati, 215 F.3d 561, 572 (6th Cir. 2000), cert. denied, 531 U.S. 1052 (2000); see also Line v. Tenn. Valley Authority, 128 F.3d 337, 347-48 (6th Cir. 1997).

**1. Direct Evidence of Discriminatory Discharge**

A plaintiff can prove discriminatory discharge by putting forth direct evidence that the defendant had a discriminatory motive in discharging the plaintiff.  Smith v. Chrysler Corp., 155 F.3d 799, 805 (6th Cir. 1998).  For example, a plaintiff alleging disability discrimination may show that his employer told him "I fired you because you are disabled."  Id.  However, "[r]arely will there be direct evidence from the lips of the defendant proclaiming his or her racial animus." Robinson v. Runyon, 149 F.3d 507, 513 (6th Cir. 1998).  In determining whether a communication rises to the level of direct evidence of discrimination, a Court must consider whether "a decision maker or an agent made the comment, whether the comment was related to the decision making process, and whether the comment and the discriminatory act were close in time." Das v. Ohio State Univ., 115 F. Supp.2d 885, 889 (S.D. Ohio 2000), citing, Cooley v. Carmike Cinemas, Inc., 25 F.3d 1325, 1330 (6th Cir. 1994).

Plaintiff has failed to offer any direct evidence that he was discharged because of his

14

race.  Indeed, plaintiff himself states: "The reason given [for discharge] by United Diary was that I didn't report for work."  Although plaintiff disagrees with this reason, the fact remains he has offered no direct evidence to support his claim of discriminatory discharge.

## 2.  Circumstantial Evidence of Discriminatory Discharge

Circumstantial evidence of race discrimination is properly analyzed under the McDonnell Douglas framework.  First, the plaintiff must prove a prima facie case of discrimination by a preponderance of the evidence.  Alexander v. Local 496, Laborers' Int'l Union, 177 F.3d 394, 402 (6th Cir. 1999), cert. denied, 528 U.S. 1154 (2000).  A prima facie case consists of the following four elements: (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for the position; (3) the defendant subjected the plaintiff to an adverse employment action; and (4) the defendant did not subject similarly situated persons outside the protected class to such adverse action.[6]  Id. at 402-03; see also Mitchell v. Toledo Hospital, 964 F.2d 577, 582-83 (6th Cir. 1992).  If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for their adverse action. Alexander, 177 F.3d at 403; Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1082 (6th Cir. 1994).  If this burden is met, plaintiff must prove that the defendant's proffered reason is a mere pretext for discrimination.  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993); Alexander, 177 F.3d at 403.

### a.  Prima Facie Case

With regards to plaintiff proving a prima facie case, defendant only disputes the existence of the fourth prong, which is that the defendant did not subject similarly situated persons outside

---

[6] Sometimes the fourth prong is stated as, "Plaintiff was replaced by someone outside the protected class." However, plaintiff has not come forth with any evidence indicating United Dairy replaced him with another driver outside plaintiff's protected class.

15

the protected class to the adverse employment action.  Defendant asserts plaintiff cannot prove

defendant treated any employees outside plaintiff's class more favorably than they treated

plaintiff.

Any comparables offered by a plaintiff must be "similarly-situated *in all respects*."

Mitchell v. Toledo Hospital, 964 F.2d 577, 583 (6th Cir. 1992), citing, Stotts v. Memphis Fire

Dept., 858 F.2d 289 (6th Cir. 1988).  The Sixth Circuit has further elaborated on the meaning of

"similarly situated":

> [T]he individuals with whom the plaintiff seeks to compare his/her treatment must
> have dealt with the same supervisor, have been subject to the same standards and
> have engaged in the same conduct without such differentiating or mitigating
> circumstances that would distinguish their conduct or the employer's treatment of
> them for it.

Mitchell, 964 F.2d at 583.

Plaintiff has failed to present any evidence that similarly situated employees outside

plaintiff's protected class were not subjected to the same adverse actions as plaintiff.  What is

more, defendant United Dairy has offered several examples of Caucasian drivers being

discharged for similar and less severe offenses.  Plaintiff lost his employment with defendant as

a result of failing to report to work and not calling off.  However, a white employee named

Richard Sorg was terminated on April 15, 2002 for merely not completing his designated route.

(Tucker Aff. ¶ 26; Tucker Aff. Ex. 4).  Further, an employee named James Doty was separated

from employment for refusing to perform a scheduled delivery route on a single day, while

plaintiff failed to work on multiple days.  (Tucker Aff. ¶ 26; Tucker Aff. Ex. 4).  Finally, James

Scritchfield, another white employee, was terminated on October 16, 2000 for not calling off and

for failing to report for three days.  (Tucker Aff. ¶ 26; Tucker Aff. Ex. 4).  Therefore, in light of

16

these facts, as well as the fact that plaintiff has failed to present any evidence of unequal treatment among similarly situated employees, the Court finds plaintiff has failed to satisfy the fourth element of a prima facie case of discriminatory discharge.

### b. Pretext

Even assuming plaintiff could prove a prima facie case of race discrimination, defendant has articulated a legitimate, nondiscriminatory reason for plaintiff's loss of employment. Defendant asserts that the reason plaintiff lost his employment was because he failed to show up or call off on the following three days: (1) Monday July 15, 2002, (2) Tuesday July 16, 2002, and (3) Thursday July 18, 2002.  Further, the CBA provides that "a complete loss of seniority shall be suffered by an employee" who "fails to report his absence from work within three (3) days to the Company Management."  (Carson Aff. ¶ 11, Ex. 1 at 12).  Plaintiff failed to report his absences within the three day requirement.

After a defendant has met its burden of articulating a legitimate, nondiscriminatory reason for the adverse action, "the plaintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation." Manzer, 29 F.3d at 1083.  A plaintiff can refute the employer's nondiscriminatory reason "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." Dews v. A.B. Dick Co., 231 F.3d 1016, 1021 (6th Cir. 2000).  The plaintiff bears the burden of showing that the defendant's proffered reason is pretextual.[7]  Id., citing McDonnell Douglas, 411 U.S. at 802-04.

---

[7] Defendant United Dairy notes a recent decision by Judge Marbley of this Court embracing a change in the standard for demonstrating pretext.  In Carey v. FedEx Ground Package System, Inc., 321 F. Supp.2d 902 (S.D. Ohio 2004), this Court held that a plaintiff may prove by a preponderance of the evidence either of the following: (1) that the defendant's proffered reason is not true, but is instead a pretext for discrimination, or (2) that the defendant's proffered reason, while true, is only one of the reasons for its conduct, while another motivating factor is the

Clearly, defendant's reasons for discharging plaintiff are based in fact.  Plaintiff failed to show up for work on three days in one week.  As a result of plaintiff's failure to report to work, defendant United Dairy's deliveries were late and the largest customer on plaintiff's route complained.  Plaintiff does not dispute this fact, but rather, claims that his name and route were not on the weekly schedule.  However, as a regular route driver, plaintiff's name was routinely not on the weekly schedule and plaintiff performed his route nonetheless.  For example, just one week prior to the week of July 14, plaintiff was not on the schedule but still performed his weekly duties without incident.

Second, plaintiff's failure to work as scheduled or notify management of his absence clearly motivated defendant to discharge plaintiff.  As stated previously, United Dairy routinely discharges employees for failing to report to work as scheduled.  Plaintiff has failed to offer any evidence that his absence from work on three days did not in fact motivate defendant to discharge him from the company.

Finally, defendant's reasons are sufficient to justify discharging an employee.  Defendant's customers rely on deliveries from United Dairy for their own businesses.  When drivers such as plaintiff fail to show up for work without calling off, defendant is faced with finding a replacement driver and sometimes, as in the present case, receives complaints from customers for late deliveries.  These problems that result from late deliveries are sufficient to

---

plaintiff's protected characteristic.  This second option, the "mixed-motive alternative," has not been addressed by any circuit courts, and there seems to be a split even in this Court about its applicability.  See e.g. Gover v. Speedway Super America, LLC, 284 F. Supp.2d 858, 865 fn.1 (S.D. Ohio 2003) (holding that the mixed-motive alternative did not apply in the court's summary judgment analysis).  The Court is hesitant to apply the mixed-motive approach since neither the Sixth nor any other Circuit Courts have spoken on the issue.  The Court notes, however, that even if the mixed-motive alternative did apply to the present summary judgment analysis, the plaintiff has failed to offer any evidence that defendant's race was a motivating factor in his loss of employment.  The plaintiff has utterly failed to prove that defendant's motive in discharging plaintiff was anything other than plaintiff's failure to report to work on three separate days.

18

justify discharging an employee for failing to show up for their regular scheduled route.

The Court finds plaintiff has failed to establish pretext.  Therefore, defendant is entitled to summary judgment with respect to the discriminatory discharge claim.

### D.  Retaliation

Plaintiff claims "I believe I was subjected to retaliation for complaining, in violation of Title VII of the Civil Rights Act of 1964 as amended."  (Pl. Compl. 1).  It is unclear what "complaining" plaintiff is referring to, but his only relevant complaint for retaliation purposes is his two public protests.  Thus, the Court will assume plaintiff is referring to his public protests. Defendant asserts that plaintiff cannot establish a prima facie case of retaliation.  Defendant further argues even if plaintiff could prove a prima facie case, he cannot prove that United Dairy's reasons for discharging him are a pretext.

Title VII states the following:

> "It shall be an unlawful employment practice for an employer to discriminate against any of his employees...because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

42 U.S.C. § 2000e-3(a).  The McDonnell Douglas burden shifting framework also applies to Title VII retaliation claims.  Zanders v. Nat'l R.R. Passenger Corp., 898 F.2d 1127, 1134 (6th Cir. 1990).  To establish a prima facie case of retaliation under Title VII, a plaintiff must prove: "(1) he engaged in activity protected by Title VII; (2) the exercise of his civil rights was known to the defendant; (3) thereafter, the defendant took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action."  Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir. 2000).  If the employer then

19

offers a legitimate nondiscriminatory explanation, the employee bears the ultimate burden of demonstrating that the employer's reason is pretextual.  Zanders, 898 F.2d at 1135.

## 1.  Prima Facie Case

Plaintiff has failed to prove a prima facie case of retaliation.  Specifically, plaintiff has not engaged in a protected activity nor is there a causal connection between his protests and his termination.

Protected activities for Title VII retaliation purposes can generally be categorized as either opposition or participation.  See Booker v. Brown & Williamson Tobacco Co., Inc., 879 F.2d 1304, 1312 (6th Cir. 1989).  Opposition activities occur when an employee "has opposed any practice made an unlawful employment practice by [Title VII]...."  42 U.S.C. § 2000e-3(a). The distinction between the two types of activities is significant because "federal courts have generally granted less protection for opposition than for participation in enforcement proceedings."  Furthermore, "'the opposition clause' [citation omitted] does not protect all 'opposition' activity."  Holden v. Owens-Illinois, Inc., 793 F.2d 745, 751 (6th Cir. 1986), cert. denied, 479 U.S. 1008.  That is, an employee is not protected if his "conduct in protest of an unlawful employment practice so interferes with the performance of his job that it renders him ineffective in the position for which he was employed."  Booker, 879 F.2d at 1312, quoting, Rosser v. Laborer's Int'l Union, 616 F.2d 221, 223 (5th Cir. 1980), cert. denied, 449 U.S. 886.

Williams' conduct, properly classified as opposition, did in fact interfere with the performance of his job.  During the course of his July 2002 protest, Williams missed three days of work.  As stated previously, United Dairy had to find a replacement driver and deliveries were late as a result.  Also, in response to a co-worker telling him that he was on the schedule for that

20

week, plaintiff simply laughed and kept marching.  (Williams Dep. 361-63).  The protest was a clear violation of company rules as outlined in the CBA.  See Booker 879 F.2d at 1312 (explaining how an employee is not protected when he violates legitimate rules and orders of his employer).  Also, plaintiff had alternative means to express his complaints.  In the past, he had lodged complaints directly with his supervisors who then took immediate action to help remedy the situation.  Moreover, the CBA contains a specific provision for filing grievances.  Plaintiff had filed a grievance under the CBA procedures in the past and had signed off on the final result.

Therefore, since plaintiff's conduct interfered with his job to such an extent, and considering the other procedures available to him for filing complaints, the Court finds plaintiff's conduct does not qualify as protected activity for retaliation purposes.

The fourth prong of a prima facie case, causal connection, can be established in one of two ways: "(1) through direct evidence; or (2) through knowledge coupled with a closeness in time that creates an inference of causation."  Nguyen, 229 F.3d at 566, quoting, Parnell v. West, 1997 WL 271751, *2 (6th Cir. 1997).  However, "temporal proximity alone will not support an inference of retaliatory discrimination when there is no other compelling evidence." Id.  The Sixth Circuit has elaborated on the fourth element of the prima facie case:

> To establish the causal connection required in the fourth prong, a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not [engaged in the protected activity].  Although no one factor is dispositive in establishing a causal connection, evidence that the defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation.

Nguyen, 229 F.3d at 563 (internal citations omitted).

Plaintiff has failed to offer any direct evidence of a causal connection between his

protests and his subsequent termination by United Dairy.  Regarding the August 2001 protest, plaintiff cannot establish an inference of causation since it occurred almost eleven months prior to his discharge.  The Sixth Circuit has stated that, in order to prove a prima facie case, proximity between the events must be a short period of time, "usually less than six months."  See DiCarlo v. Potter, 358 F.3d 408, 421 (6th Cir. 2004), quoting, Parnell v. West, 1997 WL 271751, at *3 (6th Cir. May 21, 1997).  Regarding the July 2002 protest, plaintiff again cannot establish a causal connection.  The proximity between the protest and plaintiff's subsequent loss of employment is a matter of days.  However, "temporal proximity alone will not support an inference of retaliatory discrimination when there is no other compelling evidence."  Nguyen, 229 F.3d at 566, quoting, Parnell v. West, 1997 WL 271751, *2 (6th Cir. 1997).  Besides the existence of temporal proximity, plaintiff has not even offered a scintilla of evidence from which this Court could draw an inference that plaintiff would not have lost his employment had it not been for the July 2002 protest.

The Court finds plaintiff has failed to demonstrate a causal connection between his protests and his loss of employment at United Dairy.  Therefore, defendant is entitled to summary judgment on the retaliation claim.

**2.  Pretext**

Even if plaintiff could prove a prima facie case of retaliation, he still cannot prove that defendant's reasons for his termination are a pretext.  The Court adopts the same reasoning given in Part III.C.2.b. concerning plaintiff's inability to prove pretext for his claim of discriminatory discharge.

**E.  Defamation**

Defendant avers that plaintiff's defamation claim must fail as a matter of law since plaintiff cannot establish a prima facie case.  Specifically, defendant asserts plaintiff cannot prove a false statement was made and that plaintiff was injured.

A prima facie claim of defamation consists of the following elements: (1) defendant made a false statement, (2) the false statement was defamatory, (3) the statement was published, (4) injury to the plaintiff, and (5) defendant acted with the required degree of fault.  Sweitzer v. Outlet Communications, Inc., 726 N.E.2d 1084, 1088 (Ohio Ct. App. 1999); Celebrezze v. Dayton Newspapers, Inc., 535 N.E.2d 755, 759 (Ohio Ct. App. 1988).  The entry of summary judgment in a defendant's favor is appropriate if it appears, upon the uncontroverted facts of record, that any one of the critical elements cannot be established.  Celebrezze, 535 N.E.2d at 759; see also Dupler v. Mansfield Journal Co., 413 N.E.2d 1187 (Ohio 1980).

Plaintiff's claim is based on the alleged statement United Dairy made to Advantage Tank Lines concerning plaintiff's accident while working for United Dairy.  Plaintiff alleges that United Dairy hindered his employment chances with Advantage by falsifying an accident report. In light of the Court's evidentiary ruling striking the phone inquiry and the April 2003 letter from the record, plaintiff has failed to offer any admissible evidence to prove a false statement was made.  These two documents are the only evidence plaintiff offers to prove the false statement was made to Advantage Tank Lines.  Further, plaintiff has failed to offer evidence of injury from the alleged false statement.  Contrary to plaintiff's claim that this alleged incident hindered his employment chances with Advantage, Advantage indicated that it would not have hired plaintiff even if it never received any information from United Dairy.  (Parlaky Affid. ¶ 8).

23

This is because plaintiff's background check revealed that plaintiff failed to provide Advantage with all of his prior employment, including other job-related vehicular accidents he had been involved in. (Parlaky Affid. ¶ 8(H)).

The Court finds as a matter of law that plaintiff has failed to prove a prima facie case of defamation. Therefore, defendant is entitled to summary judgment with respect to the defamation claim.

## IV. DISPOSITION

For all of the foregoing reasons, the Court **GRANTS** defendant's motion to strike and **GRANTS** defendant's motion for summary judgment on all of plaintiff's claims. Plaintiff's claims are hereby dismissed with prejudice.

The Clerk shall enter final judgment in defendant's favor, and against plaintiff, dismissing all of plaintiff's claims with prejudice.

The Clerk shall remove Docs. 26 & 33 from the Court's pending motions list.

The Clerk shall remove this case from the Court's pending cases list.

**IT IS SO ORDERED.**

/s/ George C. Smith
**GEORGE C. SMITH, JUDGE**
United States District Court